United States Court of Appeals,

Eleventh Circuit.

No. 94-4878.

Beth Ann FARAGHER, Nancy Ewanchew, Plaintiffs-Appellants-Cross-Appellees,

v.

CITY OF BOCA RATON, a political subdivision of the State of Florida, Defendant-Appellee-Cross-Appellant,

Bill Terry, David Silverman, Defendants-Appellees.

Feb. 8, 1996.

Appeals from the United States District Court for the Southern District of Florida. (No. 92-8010-CIV-SH), Shelby Highsmith, Judge.

Before COX, Circuit Judge, DYER, Senior Circuit Judge, and GOETTEL[*], Senior District Judge.

COX, Circuit Judge:

In this case we must decide several important questions regarding hostile work environment sexual harassment under Title VII.

## I. FACTS[1]

Beth Ann Faragher and Nancy Ewanchew worked as ocean lifeguards for defendant City of Boca Raton, Florida (the "City"), in the Parks and Recreation Department's Marine Safety Section. Only four to six of the forty to fifty lifeguards were female. The Marine Safety Headquarters was a small, one-story building with limited facilities, and all of the lifeguards shared the same locker room and shower. The tight quarters and high male-female

---

[*]Honorable Gerard L. Goettel, Senior U.S. District Judge for the Southern District of New York, sitting by designation.

[1]The facts are drawn from the district court's Findings of Fact.

ratio apparently led to a rambunctious atmosphere among the lifeguards.

During the relevant time frame, defendants Bill Terry and David Silverman acted as supervisors of the ocean lifeguards, Terry as Chief of the Marine Safety Section and Silverman as a Marine Safety lieutenant and then captain. Terry had the authority to supervise all aspects of the lifeguards' work assignments; to give oral reprimands and place reports of disciplinary actions in personnel files; and to interview and select new lifeguards, subject to approval by higher management. Silverman had supervisory authority over the lifeguards' daily duties, including designating work assignments and supervising physical fitness routines.

The Marine Safety Section was organized according to a clear chain of command. Lifeguards reported to Marine Safety lieutenants, and above them to captains; the captains reported directly to the Chief of the Marine Safety Section, who was directly supervised by the Recreation Superintendent; the Recreation Superintendent reported to the Director of Parks and Recreation, who reported to the City Manager. Lifeguards had almost no contact with City officials such as the Recreation Superintendent. Marine Safety Headquarters was in a remote location, far away from City Hall.

Marine Safety Chief Terry subjected both Faragher and Ewanchew to uninvited and offensive touching, and Ewanchew to offensive language as well. For example, Terry would put his arm around Faragher and rest his hand on her buttock. In a particularly

egregious example of Terry's touching, Terry pressed himself against Ewanchew's buttocks and simulated sexual movement while the two were at the water fountain.  Other female lifeguards similarly were subjected to Terry's uninvited and offensive touching and to his demeaning and offensive comments.

Lieutenant Silverman made offensive comments and gestures to both Faragher and Ewanchew.  For example, in the presence of both Faragher and Ewanchew, as well as other lifeguards, Silverman engaged in a pantomime depicting cunnilingus.  Examples of Silverman's offensive comments include saying to Faragher, after tackling her, "If you had tits I would do you in a minute," and to Ewanchew, "There are a lot of tits on the beach today."  Silverman also made offensive remarks to other female lifeguards.

Neither Ewanchew nor Faragher complained to Parks and Recreation Department management about Terry's and Silverman's conduct while they were employed with the City or when they resigned.  However, they both spoke about Terry's and Silverman's conduct with one of their supervisors, Marine Safety Lieutenant and Training Captain Robert Gordon.  In fact, most of the female lifeguards complained to Gordon about Silverman's language and conduct.  The lifeguards did not speak with Gordon on a subordinate to superior basis;  they spoke with him because they held him in high repute.  Gordon did not report the complaints to his supervisor, Terry, or to any other City official.

Ewanchew resigned from her position with the City in April of 1989, saying that she was leaving because she had found a better job.  At some time after her resignation, Ewanchew visited Terry

and requested re-employment on a part-time basis.  She was not re-employed.  Faragher resigned in June of 1990 to attend law school.  Her decision to leave was unrelated to the alleged sexual harassment.  She did not discourage her sister from applying for a lifeguard position with the City.

In April of 1990, Ewanchew wrote a letter to the City's Director of Personnel complaining that she and other female lifeguards had been sexually harassed by Terry and Silverman while she was employed by the City.  The City did not know of Terry's and Silverman's conduct until receiving Ewanchew's letter.  The City then investigated Ewanchew's complaint, determining that Terry and Silverman had engaged in some inappropriate conduct.  The City reprimanded and disciplined them both.

## II. PROCEDURAL BACKGROUND

In 1992, Faragher and Ewanchew sued the City, Terry, and Silverman.  Faragher sued the City for sexual harassment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Count I).  Faragher and Ewanchew each sued Terry and Silverman for sexual harassment under 42 U.S.C. § 1983 (Counts II and III).  Faragher and Ewanchew also asserted pendent state law claims.  Faragher and Ewanchew each sued Terry for battery (Counts IV and V) and the City for negligent retention and supervision of Terry (Counts VI and VII).  The district court held a non-jury trial on all claims.

The district court entered judgment for Faragher on her Title VII claim against the City, awarding her $1 in nominal damages.  The court held that Terry's and Silverman's offensive conduct was

sufficiently severe and pervasive to alter the conditions of Faragher's employment by creating a hostile work environment. The court held that the City was directly liable for Terry's and Silverman's conduct under agency principles based on Terry's and Silverman's supervisory authority and the overall workplace structure. In addition, the court held that the City was indirectly liable for Terry's and Silverman's offensive conduct because the court's finding that the conduct was severe and pervasive "supports an inference of knowledge, or constructive knowledge, on the part of the City regarding Terry's and Silverman's sexual harassment."

The district court entered judgment for Faragher on her § 1983 claim against Terry and Silverman. Noting that the Eleventh Circuit has not recognized a § 1983 cause of action for sexual harassment, the court held that such a cause of action is cognizable based on the weight of authority from other circuits.[2] The court found that Terry and Silverman acted under color of state law based on their supervisory authority. The court found that Faragher had proved her § 1983 claim by showing actionable sexual harassment under Title VII and intent to harass based on membership in a particular class, i.e., females. The court rejected Terry's qualified immunity defense. The court awarded Faragher $10,000 in

---

[2]Neither Terry nor Silverman contends on appeal that sexual harassment is not cognizable under § 1983. We assume for purposes of this appeal, but do not decide, that a sexual harassment claim is cognizable under § 1983. The district court held that a sexual harassment claim under § 1983 has two elements: (1) sexual harassment, and (2) intent to harass based on membership in a particular class. The court held that the harassment prong is satisfied by showing actionable sexual harassment under Title VII.

compensatory damages against Terry and Silverman, jointly and severally.

The district court entered judgment for Terry and Silverman on Ewanchew's § 1983 claim. The court held that Ewanchew did not prove her § 1983 claim because she failed to show actionable sexual harassment under Title VII.[3] Specifically, the court found that Ewanchew's request for re-employment after resigning "makes it illogical to find a perception of hostility in the work environment on her part." In addition, the court found that Ewanchew's testimony that Terry's and Silverman's conduct was intolerable at the time was not credible. The court held that Ewanchew therefore had not satisfied the requirement that an employee subjectively perceive the work environment to be abusive. *See Harris v. Forklift Systems, Inc.,* --- U.S. ----, ----, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993).

The court entered judgment for Faragher on her battery claim against Terry and for Ewanchew on her battery claim against Terry. The court awarded Ewanchew $35,000 in compensatory damages and $2,000 in punitive damages. Faragher was awarded $500 in punitive damages.

The court entered judgment for the City on both Faragher's and Ewanchew's negligent retention claims. The court held that its finding that the City had constructive notice of Terry's and Silverman's conduct for purposes of Title VII liability did not mean that the City had constructive notice of Terry's conduct for

---

[3]As explained in note 2, the district court held that one element of a § 1983 sexual harassment claim is showing harassment under Title VII.

purposes of negligent retention liability.  Applying to the City the reasonable employer standard, the court found insufficient proof that the City should have known of Terry's conduct before Ewanchew's letter.

Faragher and Ewanchew appeal.  The City cross-appeals.

### III. ISSUES ON APPEAL

The issues presented on appeal are:  (1) whether, to recover under Title VII for hostile environment sexual harassment, an employee must subjectively perceive the work environment to be abusive at the time that she is employed;  (2) whether the district court erred in relying on conduct of which Faragher was unaware in determining that Terry's and Silverman's conduct was sufficiently severe or pervasive to alter the conditions of her employment in violation of Title VII;  (3) whether the district court erred in finding that Faragher was subjected to an abusive work environment and perceived the environment to be abusive;  (4) whether, under Title VII, the City may be directly liable for Terry's and Silverman's hostile environment harassment of Faragher, regardless of its actual or constructive knowledge of that harassment;  (5) whether, under Title VII, the district court erred in finding that the City had constructive knowledge of Terry's and Silverman's conduct based on its pervasiveness;  and (6) whether, under Florida law, the district court erred in finding that the City had no constructive knowledge of Terry's unfitness for purposes of the negligent retention claims.

We are not presented with any challenge to the district court's judgment for Faragher on her § 1983 claim against Terry and

Silverman.  Nor are we presented with a challenge to the district court's judgment for Faragher and Ewanchew on their battery claims against Terry.

## IV. STANDARDS OF REVIEW

We review the district court's findings of fact under the clearly erroneous standard of review.  *Pullman-Standard v. Swint,* 456 U.S. 273, 287-88, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). The question of actual or constructive knowledge is an issue of fact reviewed for clear error.  *Reich v. Department of Conservation and Natural Resources, State of Ala.,* 28 F.3d 1076, 1082 (11th Cir.1994).  We review the district court's conclusions of law and its application of law to facts  *de novo.  Massaro v. Mainlands Section 1 & 2 Civic Assn., Inc.,* 3 F.3d 1472, 1475 (11th Cir.1993), *cert. denied,* --- U.S. ----, 115 S.Ct. 56, 130 L.Ed.2d 15 (1994).

## V. DISCUSSION

A. *Ewanchew's Subjective Perception That Work Environment Was Abusive Under Harris.*

Ewanchew contends that the district court erred in holding that she did not satisfy the subjective prong of the hostile environment test in *Harris v. Forklift Systems,* --- U.S. ----, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).  Under *Harris,* Title VII is not violated unless the victim of harassment subjectively perceives the work environment to be abusive, because otherwise the harassment has not altered the conditions of the victim's employment. *Harris,* --- U.S. at ----, 114 S.Ct. at 370.  The district court found that Ewanchew did not perceive her work environment to be abusive because her testimony to that effect was not credible and because she asked Terry to re-employ her at some time after she resigned.

Ewanchew approaches the district court's holding that she did not satisfy *Harris* from two different angles. First, she argues that the district court's factual finding that she did not perceive her work environment to be abusive is inconsistent with its finding that she suffered $35,000 in damages on her battery claim. According to Ewanchew, the $35,000 damages finding is correct and leads ineluctably to the conclusion that she perceived her work environment to be abusive. Ewanchew's second tack is to contend that the district court erroneously engrafted onto *Harris* 's subjective prong a requirement for present-sense revulsion. *Harris* 's subjective prong is satisfied, she argues, by after-the-fact realization of the offensiveness of the perpetrator's conduct. Terry responds to both of Ewanchew's arguments by contending that the district court's finding is not clearly erroneous.

Ewanchew has not demonstrated that the district court's factual findings are inconsistent. On Ewanchew's battery claim, the court found that Terry's offensive touching caused Ewanchew $35,000 in damages for psychological or emotional injury. A finding of damages resulting from an offensive touching—even if the touching, when combined with other conduct, constitutes sexual harassment—does not necessarily mean that the victim of the touching perceived her *work environment* to be abusive. Although the district court makes no specific finding as to when Ewanchew suffered damages, Ewanchew's damages from the battery seem to have occurred some time after she resigned from her lifeguard position with the City. In Ewanchew's Reply Brief and at oral argument, Ewanchew's counsel conceded that Ewanchew suffered a delayed

reaction to the offensive conduct, but argued that Ewanchew's delayed reaction satisfies *Harris.* Notably, Ewanchew has pointed to no evidence in the record indicating that she suffered damages from the battery before she resigned.

Under this view of the battery damages award, the district court's findings are not inconsistent. The district court reasonably could have found that Ewanchew did not view her work environment as abusive but, after resigning, suffered emotional or psychological trauma from the offensive touchings. Thus, it is not inconsistent, under this view of the facts, to award damages on Ewanchew's battery claim while finding that Ewanchew did not satisfy *Harris,* at least as the district court read *Harris.*

Nor is the district court's finding that Ewanchew did not perceive her work environment to be abusive clearly erroneous. The district court found "not credible [Ewanchew's] present assertion that she found [Terry's and Silverman's] conduct intolerable, *then*." Furthermore, the court found that Ewanchew "appears to have tolerated such conduct not because she felt she had to but because it wasn't that important to her." In addition to these findings based on the credibility of Ewanchew's testimony, the court determined that it would be illogical to find a perception of hostility on Ewanchew's part in light of her request for a part-time job after she left the City's employ.

Ewanchew contends that, even if she did not perceive her work environment to be abusive at the time, she satisfied *Harris* 's subjective prong so long as she felt offended or abused after the fact. The parties have not pointed us to any federal case

addressing after-the-fact perceptions of abuse under *Harris*.[4] According to Ewanchew, the subjective prong's *raison d'etre* is satisfied by after-the-fact realization of the offensiveness of the perpetrator's conduct. The subjective prong, she argues, ensures that the alleged conduct injured this particular plaintiff. We cannot agree that this is the subjective prong's only purpose.

*Harris* 's subjective prong ensures that the alleged conduct altered the conditions of the plaintiff's employment. *See Harris,* --- U.S. at ----, 114 S.Ct. at 370. Otherwise, Title VII is not implicated. Title VII makes it unlawful "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1). Sexual harassment constitutes discrimination based on sex but is actionable under Title VII only if it alters the terms or conditions of the victim's employment. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). Hence *Harris* 's subjective prong: "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Harris,* --- U.S. at ----, 114 S.Ct. at 370.

Under *Harris,* then, Title VII is not violated when the victim of harassment does not perceive her work environment to be abusive at the time that she is employed. *But cf. Kimzey v. Wal-Mart*

---

[4]Ewanchew cites two cases from other circuits interpreting *Harris* 's subjective prong but neither addresses after-the-fact perceptions of abuse. *See Dey v. Colt Construction & Development Co.,* 28 F.3d 1446 (7th Cir.1994); *King v. Hillen,* 21 F.3d 1572 (Fed.Cir.1994).

*Stores, Inc.,* 907 F.Supp. 1309 (W.D.Mo.1995) (interpreting *Harris* as not requiring well-defined, subjective belief of hostility at exact moment an incident occurs). An employee's conditions of employment are not affected by what happens after she resigns. After-the-fact realization of the offensiveness of conduct thus does not satisfy *Harris;* it is irrelevant to whether the employee's conditions of employment were altered. Thus, contrary to Ewanchew's contention, the district court did not err in requiring Ewanchew to prove that she perceived her work environment to be abusive during the term of her employment. Because she did not perceive her environment to be abusive, Terry's and Silverman's conduct did not alter the conditions of her employment and, therefore, she cannot recover for their conduct under Title VII.

B. *Whether Terry's and Silverman's Conduct Was Sufficiently Severe and Pervasive To Alter Faragher's Conditions of Employment.*

On its cross-appeal, the City contends that the district court erred in relying on conduct of which Faragher was unaware in determining that Terry's and Silverman's conduct was so pervasive and severe as to alter Faragher's conditions of employment. Faragher does not contend that the district court properly relied on conduct of which Faragher was unaware.

The district court's opinion is somewhat ambiguous as to this issue, but parts of the opinion make it at least arguable that the district court relied on conduct of which Faragher was unaware in determining that Terry's and Silverman's conduct was so pervasive and severe as to alter Faragher's conditions of employment. The district court erred to the extent that, in making this determination, it relied on conduct of which Faragher was unaware.

*See Edwards v. Wallace Community College,* 49 F.3d 1517, 1522 (11th Cir.1995); *see also Hirase-Doi v. U.S. West Communications, Inc.,* 61 F.3d 777, 782 (10th Cir.1995).  In a case of hostile environment sexual harassment, an employee's conditions of employment cannot be altered by conduct of which she is unaware.  Moreover, conduct of which an employee is unaware cannot contribute to her subjective view of the work environment as hostile.  *Edwards,* 49 F.3d at 1522; *Hirase-Doi,* 61 F.3d at 782.[5]

The City argues that, if the district court had considered only conduct of which Faragher was aware, it could not have found that Faragher was subjected to an abusive work environment.  The City further contends that the district court erred in finding that Faragher subjectively perceived her work environment as hostile or abusive in light of her apparent nonchalance toward her environment, her failure to complain, and her failure to caution her sister about applying for a job as a lifeguard with the City.  Faragher responds that the evidence supports the district court's findings that Terry's and Silverman's conduct, as known to Faragher, was sufficiently severe and pervasive to create an abusive work environment, and that Faragher subjectively perceived her environment as abusive.

If, as the City argues, the district court indeed relied on conduct of which Faragher was unaware in determining that her work environment was abusive, the extent of the court's reliance on that conduct is unclear.  However, that question need not detain us.  We

---

[5]Of course, evidence of harassment of which Faragher was unaware may be relevant to the extent that it corroborates her allegations.

have no doubt that the district court would have found that Faragher's work environment was abusive, both objectively and subjectively, based solely on the conduct of which Faragher was aware. Indeed, the record suggests that it might have been clear error for the district court, having credited Faragher's testimony, to find otherwise.

In determining whether a work environment is abusive or hostile, the totality of the circumstances must be considered. Relevant circumstances include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* --- U.S. at ----, 114 S.Ct. at 371. Our review of the record reveals that Faragher was subjected to frequent and severe discriminatory conduct by Terry and Silverman. While some of the conduct might be characterized as "mere offensive utterance," other conduct was physically threatening (for example, being tackled by Silverman) and humiliating (for example, Silverman's comments about Faragher's body, the terms he used to describe women, and his pantomime of oral sex). We need not catalogue all of the conduct to which Faragher was subjected, for we have no trouble concluding that Terry's and Silverman's conduct, as known to Faragher, was severe and pervasive enough to create an objectively abusive work environment.

We also conclude that the district court's finding that Faragher subjectively perceived her work environment to be abusive is not clearly erroneous. The district court based its finding

largely on the credibility of Faragher's testimony. The court considered Faragher's failure to complain or to caution her sister about applying for a lifeguard position, but concluded that other factors explained her actions. We cannot say that the district court clearly erred in its resolution of this issue.

C. *Direct Liability of City for Hostile Environment Sexual Harassment.*

The City also contends on its cross-appeal that the district court erred as a matter of law in holding the City directly liable for Terry's and Silverman's conduct under Title VII, without regard to whether the City had actual or constructive knowledge of the conduct. Citing *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311 (11th Cir.1989), the City argues that it may be liable under Title VII for hostile environment sexual harassment only indirectly through *respondeat superior;* that is, only if it knew or should have known of the sexual harassment and failed to take prompt remedial action. Faragher concedes that, under *Steele,* the City is not directly liable for Terry's and Silverman's conduct.

This is a pure hostile environment case. The district court acknowledged our admonition in *Steele* that holding employers strictly liable for a supervisor's sexual harassment is illogical in a pure hostile environment setting. The court expressly found that the City had no actual knowledge of Terry's and Silverman's sexual harassment before receipt of Ewanchew's letter. Nevertheless, relying on our decisions in *Huddleston* and *Vance,* the court held the City directly liable for Terry's and Silverman's conduct because it found that they were the City's agents. *See Vance v. Southern Bell Tel. & Tel. Co.,* 863 F.2d 1503, 1512 (11th

Cir.1989), *overruled on other grounds, Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); *Huddleston v. Roger Dean Chevrolet, Inc.,* 845 F.2d 900, 904 (11th Cir.1988). It held that Faragher need not show either actual or constructive notice to the City, notwithstanding our statement in *Steele* that corporate liability exists in a pure hostile environment case only if the employer knew or should have known of the harassment. *Steele,* 867 F.2d at 1316.

The Supreme Court has declined to issue a definitive rule as to when a corporate defendant is liable for hostile environment sexual harassment under Title VII. *Meritor,* 477 U.S. at 72, 106 S.Ct. at 2408. From Congress's decision to define "employer" under Title VII to include the employer's agents, 42 U.S.C. § 2000e(b), however, the Court inferred that Congress intended for courts to look to common law agency principles in Title VII sexual harassment cases. *Meritor,* 477 U.S. at 72, 106 S.Ct. at 2408. This circuit has applied agency principles to the issue of corporate liability for sexual harassment on numerous occasions, including in *Steele, Vance,* and *Huddleston.*

Our cases establish the following rules. An employer is directly liable for sexual harassment when the harasser is acting as the employer's agent. *Steele,* 867 F.2d at 1316 n. 1; *Vance,* 863 F.2d at 1512; *Huddleston,* 830 F.2d at 904; *Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1558 (11th Cir.1987). Thus, an employer is directly liable for sexual harassment by a supervisor or other employee acting within the scope of his employment. *See Sparks,* 830 F.2d at 1558 (citing Restatement

(Second) of Agency § 219(1)). An employer also is directly liable, under agency principles, for sexual harassment by a supervisor or other employee acting outside the scope of his employment if the supervisor or employee was aided in accomplishing the harassment by the existence of the agency relationship. *Id.* at 1559-60 (citing Restatement (Second) of Agency § 219(2)(d)).[6]

Applying these agency principles, we have held that an employer is strictly liable for *quid pro quo* sexual harassment. *Henson v. City of Dundee,* 682 F.2d 897, 909-910 (11th Cir.1982). As we explained in *Steele,* a supervisor by definition acts as the company when engaging in *quid pro quo* harassment. *Steele,* 867 F.2d at 1316. The supervisor acts within the scope of his actual or apparent authority to hire, fire, discipline, or promote. Moreover, the supervisor uses the means furnished to him by the company to accomplish the harassment when using his apparent or actual authority to extort sexual consideration from the victim. *Id.* (quoting *Henson,* 682 F.2d at 910).

Whereas an employer is always directly liable for *quid pro quo* harassment, an employer rarely will be directly liable for hostile environment harassment; rather, liability will be indirect.[7] Viewed under agency principles, these seemingly disparate results make sense. A supervisor or other employee

---

[6]*Accord Gary v. Long,* 59 F.3d 1391, 1397 (D.C.Cir.), *cert. denied* --- U.S. ----, 116 S.Ct. 569, 133 L.Ed.2d 493 (1995); *Hirase-Doi,* 61 F.3d 777, 783 (10th Cir.1995); *Karibian v. Columbia University,* 14 F.3d 773, 780 (2nd Cir.), *cert. denied* --- U.S. ----, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994); *Bouton v. BMW of North America,* 29 F.3d 103, 106 (3rd Cir.1994).

[7]We discuss indirect employer liability in section V.D.

typically does not act as the company when he subjects an employee to a hostile work environment. Hence the distinction between liability for *quid pro quo* harassment and liability for hostile environment harassment:

> Strict liability is illogical in a pure hostile environment setting. In a hostile environment case, no *quid pro quo* exists. The supervisor does not act as the company; the supervisor acts outside "the scope of actual or apparent authority to hire, fire, discipline, or promote." Corporate liability, therefore, exists only through *respondeat superior*; liability exists only where the corporate defendant knew or should have known of the harassment and failed to take prompt remedial action against the supervisor.

*Id.*

With respect to employer liability for pure hostile environment harassment, *Steele* and *Vance* appear to conflict.[8] *Steele* precludes direct employer liability in a pure hostile environment case, allowing only indirect liability if the employer knew or should have known of the harassment and failed to take prompt remedial action. *Id. Vance,* on the other hand, allows direct employer liability in a hostile environment case if the harasser acted as the employer's agent. *Vance,* 863 F.2d at 1514-15.

The district court correctly reconciled this precedent in holding that an employer may be liable in a hostile environment case if either (1) the employer knew or should have known of the harassment and failed to take prompt remedial action, or (2) the harasser acted as the employer's agent. However, as we explain

---

[8]*Steele* and *Vance,* decisions issued almost contemporaneously, were the first cases in which we addressed the standard for employer liability for pure hostile environment harassment. *See Steele,* 867 F.2d at 1317; *Vance,* 863 F.2d at 1515.

below, only in an exceptional case will a harasser act as the employer's agent in creating a hostile work environment. This is not such a case. The district court erred in holding that Terry and Silverman acted as the City's agents in harassing Faragher.

The district court found that Terry and Silverman were the City's agents based on their supervisory authority and the overall structure of the workplace. We agree that Terry and Silverman were the City's agents for some purposes. But the relevant inquiry is whether they were acting as the City's agents in subjecting Faragher to a hostile work environment. *See Sparks,* 830 F.2d at 1558-59 (analyzing not whether the harasser was an agent generally but whether harasser acted as an agent when he harassed victim). Faragher does not contend that Terry and Silverman were acting within the scope of their employment when they made offensive remarks and gestures and touched her. And we have found no record evidence suggesting that they were acting within the scope of their employment when they harassed Faragher.[9]

The district court relied on *Vance* in finding that Terry and Silverman were the City's agents for direct liability purposes.

---

[9]This case is thus distinguishable from *Huddleston,* on which the district court relied in part in holding the City directly liable. In *Huddleston,* the harasser berated the victim for her job performance in the course of creating a hostile work environment. *Huddleston,* 845 F.2d at 904. Thus, the harasser acted within his supervisory authority to hire, fire, discipline, or promote. *See Steele,* 867 F.2d at 1317 n. 2. Here, however, there is no evidence that Terry or Silverman acted within their supervisory authority in creating a hostile work environment. Significantly, in *Huddleston,* the harasser's conduct constituted *quid pro quo* harassment as well as hostile environment harassment. *See id.* Thus, by definition the harasser acted as the company. Here, though, only hostile environment sexual harassment is alleged.

Plaintiff in *Vance* sued her employer for racial discrimination under 42 U.S.C. § 1981; the legal elements of a harassment claim under § 1981 were the same as they are under Title VII. *Vance,* 863 F.2d at 1509 n. 3. She alleged, *inter alia,* that she was subjected to a hostile work environment and discriminatorily disciplined because of her race. *Id.* at 1511. The district court correctly instructed the jury that the employer was liable if a supervisor acting within the scope of his employment, as an agent of the employer, harassed plaintiff. *Id.* at 1514 n. 10. The jury returned a verdict for plaintiff, but the district court granted the employer's motion for judgment notwithstanding the verdict. The district court held, *inter alia,* that the employer could not be held liable because it had adequate grievance procedures and plaintiff had failed to give the employer notice of the harassment. *Id.* at 1512. We reversed, holding that the employer's grievance procedures did not, as a matter of law, insulate it from liability. *Id.* at 1514.

We also held that an employer may be directly liable for the existence of a hostile work environment. *Id.* at 1514-15.[10] Because plaintiff in *Vance* alleged that her supervisor was an agent of the employer for direct employer liability purposes, we examined whether the evidence was sufficient for the jury to find the employer directly liable through its agent, plaintiff's

[10]We cited *Huddleston* for the rule that when the harasser acts as an agent of the employer, the harasser is the employer for purposes of Title VII, and thus the corporate employer is directly liable. *Id.* at 1514. As explained in note 9, the conduct in *Huddleston* constituted both hostile environment and *quid pro quo* harassment.

supervisor.[11]  *Id.*  We held that a reasonable jury could conclude from the evidence that the supervisor was acting as the employer's agent in creating the hostile work environment.  *Id.* at 1515.

In so holding, we listed several factors relevant to whether a harasser is acting as the employer's agent in creating a hostile work environment:  the supervisor's direct authority over the plaintiff, the overall structure of the workplace, and the relative positions of the parties.  *Id.*  The district court examined these same factors in this case in determining that Terry and Silverman were the City's agents.  However, further scrutiny of *Vance* reveals that, while those factors were directly relevant to the allegations in *Vance,* they are not dispositive here.

In *Vance,* we based our agency analysis largely on the agency analysis in *Hamilton v. Rodgers,* 791 F.2d 439 (5th Cir.1986).  *See Vance,* 863 F.2d at 1515.  In *Hamilton,* the Fifth Circuit held that two intermediate level supervisors were agents of the fire department under Title VII because "[t]hey had authority over matters such as car assignments and the staffing of shifts, and they *wielded this authority to Hamilton's detriment.*  Even more important, they filed the critical reports that led to Hamilton's 1982 suspension." *Hamilton,* 791 F.2d at 442 (emphasis added).  The supervisors had denied Hamilton a car assignment, scheduled him for the night shift, and given him poor evaluations, all for racially discriminatory reasons.  *Id.*  Thus, the supervisors' authority over

---

[11]Though we focused in our opinion on whether the jury could find that plaintiff's first supervisor, Wagner, acted as the employer's agent, the evidence also showed that other supervisors acted as the employer's agents in discriminatorily disciplining plaintiff.  *See id.* at 1507-08, 1511.

Hamilton and the structure of the workplace showed that the supervisors were acting within the scope of their employment in violating Title VII.[12]

Similarly, in *Vance,* plaintiff had presented evidence from which the properly instructed jury could infer that the supervisor was acting within the scope of his employment when he created the hostile work environment. The evidence suggested that the supervisor had hung a noose over plaintiff's work station. *Vance,* 863 F.2d at 1506. The supervisor testified that he had constructed a device which looked like a noose, but explained "that it had been designed to desheathe cable to increase productivity." *Id.* We held that a jury could conclude from this evidence that the supervisor acted as the employer's agent in creating the hostile environment. *Id.* at 1515. Viewed in light of *Hamilton,* it is evident that *Vance* 's focus on the supervisor's authority (to discipline employees, handle union grievance proceedings, and make personnel changes) and the overall structure of the workplace was aimed at determining whether the supervisor was acting within the scope of his employment when constructing the device ostensibly designed to increase productivity.[13]

---

[12]*Hamilton* involved allegations of discrimination in addition to just the creation of a hostile work environment. The Fifth Circuit seems to have predicated the employer's liability on conduct of the supervisors that did not form part of the hostile environment allegations. *See id.* Thus, it is not at all clear that the supervisors' authority and the overall structure of the workplace were relevant to the fire department's liability for the hostile work environment.

[13]Plaintiff's claim was based on allegations of discriminatory discipline as well as the noose incident. *Id.* at 1511. Though we did not refer to the discriminatory discipline in finding that the jury reasonably could conclude that the

Here, the district court mechanically applied the factors listed in *Vance* without determining their relevance to whether Terry and Silverman were acting within the scope of their employment in harassing Faragher. The harassment here consisted of offensive comments, gestures, and touching. If, for example, as in *Vance,* Terry and Silverman had constructed something offensive and intimidating to women under the guise of trying to improve lifeguard performance, then their supervisory and disciplinary authority would support a finding that they acted as the City's agents in violating Title VII. But Terry's and Silverman's supervisory and disciplinary authority does not support a finding that they were acting within the scope of their employment in subjecting Faragher to offensive language, gestures, and touching. Thus, the district court erred in holding the City directly liable for that conduct.

*Vance* demonstrates that *Steele* overstates the case in saying that, in a pure hostile environment setting, an employer may be liable *only* when the corporate defendant knew or should have known of the harassment and failed to take prompt remedial action. An employer also may be directly liable if, as in *Vance,* the harasser acted as the employer's agent in creating the hostile work environment. Still, *Steele* accurately describes the rule for employer liability in the vast majority of hostile environment cases. *Vance* 's finding of direct employer liability is unlikely

employer was directly liable for its supervisors' conduct, the supervisors clearly were acting within the scope of their employment in taking disciplinary action against plaintiff. Thus, the employer would have been directly liable on that basis as well.

to be replicated in pure hostile environment cases because the facts of that case were exceptional. Rarely will a supervisor or other employee act within the scope of his employment in creating a hostile work environment. In pure hostile work environment cases, therefore, *Steele* generally will govern employer liability.[14]

D. *Indirect Liability of City for Hostile Environment Sexual Harassment.*

---

[14]The only other possible ground for the City's direct liability would be that Terry and Silverman were aided in accomplishing the harassment by the existence of the agency relationship. *See Sparks,* 830 F.2d at 1559-60 (citing Restatement (Second) of Agency § 219(2)(d)). This basis for direct liability—like direct liability for acts within the scope of employment—typically occurs only in *quid pro quo* harassment cases. For example, in *Sparks,* the evidence showed that the harasser used the authority delegated to him by the company to assist him in the harassment; he repeatedly reminded the victim that he could fire her if she refused his advances. *Id.* at 1560. *See also Steele,* 867 F.2d at 1317 (limiting holding of *Sparks* to situations involving both *quid pro quo* and hostile environment harassment). However, even in a hostile environment case, the existence of the agency relationship may aid in accomplishing the harassment. *See, e.g., Gary v. Long,* 59 F.3d at 1397; *Karibian v. Columbia University,* 14 F.3d at 780. We therefore examine whether the district court's holding may be affirmed on this ground.

The evidence does not support a finding that Terry and Silverman were aided, within the meaning of the common law, in their harassment of Faragher by their agency relationship with the City. As the D.C. Circuit noted, a supervisor is always, in a sense, aided in accomplishing the tort by the existence of the agency because his responsibilities include close proximity to and regular contact with the victim. *Gary v. Long,* 59 F.3d at 1397. However, the common law rule does not use "aided" in such a broad sense. Rather, the employer is liable only if the harassment is accomplished by an instrumentality of the agency or through conduct associated with the agency status. *Id.* In *Vance,* for example, although the supervisor's conduct was egregiously offensive, it could be viewed as conduct associated with the agency status in that it was purportedly meant to increase productivity. Here, however, the offensive remarks, gestures, and touching cannot reasonably be viewed as conduct associated with Terry's and Silverman's status as agents of the City.

The district court found that the City had no actual knowledge of the sexual harassment but had constructive knowledge due to the harassment's pervasiveness. The City contends that the district court's finding that the City had constructive notice of the harassment is clearly erroneous and, therefore, that the City may not be held indirectly liable for the harassment. Faragher responds that the district court's finding that the sexual harassment was severe and pervasive enough to infer the City's knowledge is not clearly erroneous.

An employer is indirectly liable for hostile work environment sexual harassment if the employer knew or should have known of the harassment and failed to take prompt remedial action. *Steele,* 867 F.2d at 1316; *Vance,* 863 F.2d at 1512; *Henson,* 682 F.2d at 905.[15] A plaintiff can prove an employer's knowledge of harassment by showing that she complained to higher management. *Vance,* 863 F.2d at 1512; *Huddleston,* 845 F.2d at 904. The district court found that Faragher did not complain to higher management at the City. While several lifeguards complained to Lieutenant Gordon, the district court found that he did not rank as higher management in the City and, therefore, that notice to him should not be imputed to the City.[16]

---

[15]Agency principles are the source of indirect employer liability as well as direct employer liability. If an employer knows or should know of sexual harassment and fails to remedy the situation, then the employer is liable for its own negligence. *See Hirase-Doi,* 61 F.3d at 783; *Bouton,* 29 F.3d at 106-07.

[16]In its discussion of the City's direct liability for Terry's and Silverman's conduct, however, the court held that Gordon's knowledge of Terry's and Silverman's conduct provides a basis for holding the City liable. This was error. For the City to be directly liable for Gordon's conduct, Gordon must have

A plaintiff also can prove an employer's knowledge by showing that the harassment was pervasive enough to charge the employer with constructive knowledge. *Vance,* 863 F.2d at 1512; *Huddleston,* 845 F.2d at 904; *Henson,* 682 F.2d at 905. The district court believed that its finding that the conduct was sufficiently severe and pervasive to alter the conditions of Faragher's employment "supports an inference of knowledge, or constructive knowledge, on the part of the City regarding Terry's and Silverman's sexual harassment, making the City indirectly liable for such conduct." According to the court, the pervasiveness analysis applicable to finding that the work environment was abusive is the same as the analysis required to show the employer's knowledge.

We agree with the district court that the analyses are the same to the extent that a court must evaluate the totality of the circumstances both in determining whether the work environment was abusive and in determining whether the conduct was pervasive enough to put the employer on notice. *See Vance,* 863 F.2d at 1513. But we cannot agree with the district court's apparent belief that simply because conduct is pervasive enough to create an abusive work environment the employer should be charged with knowledge of the conduct. The question of notice to the employer is distinct from the question of the environment's abusiveness. Thus, the district court erred to the extent that it conflated the two inquiries.

harassed Faragher while acting as the City's agent. However, Gordon did not harass Faragher; he knew about someone else's inappropriate conduct. And Gordon did not receive that information as the City's agent; he received it as someone held in high repute by his colleagues.

The question of constructive knowledge is an issue of fact reviewed for clear error. *Reich,* 28 F.3d at 1082. There may be cases in which it is difficult to draw the line where conduct becomes so pervasive that the employer should have known about it. But this is not such a case. The district court expressly found that the City had no knowledge of Terry's and Silverman's conduct. Neither the district court nor Faragher has pointed to any factual basis for concluding that the City should have known of their conduct. The lifeguards were stationed at a remote location and had little contact with City officials. The district court clearly erred in finding that the City's knowledge may be inferred solely from the fact that the conduct was pervasive enough to create an abusive work environment.

E. *Constructive Knowledge of Terry's Unfitness Under Florida Negligent Retention Law.*

Finally, Faragher and Ewanchew contend that the district court erred in finding that, for purposes of their negligent supervision claims, the City did not have actual or constructive notice of Terry's conduct. Our review of the record leads us to agree with the City that the district court's finding that the City had no notice of Terry's conduct is not clearly erroneous.

## VI. CONCLUSION

We reverse the district court's judgment for Faragher on her Title VII sexual harassment claim against the City. In all other respects, we affirm the district court's judgment.

AFFIRMED IN PART; REVERSED IN PART.